Need, Justice (Bet.),
sitting by designation, delivered the opinion of the court:
In the year 1944 the plaintiff and its connecting carriers transported quantities of fuel oil distillate for the United States from Baytown, Texas, to Edmonds and Richmond Beach, two points of destination within the State of Washington. In all there were 206 shipments of this commodity; 177 went directly from Baytown to their ultimate destination, and 29 others were originally consigned to Seattle, Washington, of which all but one[1] were reconsigned from there to either Edmonds or Richmond Beach. The plaintiff was originally paid the sums which it requested for this transit under the provisions of 49 U.S.C. § 66, which allows for payment of amounts claimed subject to recoupment. After audit the disputed sums were recouped by the Government from other amounts due the carrier or were refunded under protest. The carrier seeks to recover these monies.
Necessary to a decision of this case is an understanding of existing rate structures in so far as applicable to the routes in question.
The 178 Shipments. Plaintiff contends that, as the delivering carrier, it was entitled to collect on the basis of the amounts provided in the applicable land-grant equalization agreement. At the time there was a joint single factor *335 through tariff[2] on file with the Interstate Commerce Commission which provided a rate of $1.45 per hundred pounds from Baytown to the points of destination over the route of actual movement. This was, of course, available to the Government and private shippers alike. Beginning in 1850 the United States had entered into a number of agreements with various railroads whereby, in return for a deed to the right-of-way, the railroads accorded the Government certain reduced rates for carriage over this mileage. As a consequence the more circuitous route over the land-grant mileage often proved for the Government to be the cheapest.[3] For the purpose of competing for this traffic the railroads operating the more direct route would often agree to supply that service at no more than the Government would have to pay for land-grant mileage transportation. Popularly, it would enter into a “land-grant equalization agreement.” In the present case a land-grant mileage route did exist, and the non-land-grant direct carriers had entered into a land-grant equalization agreement. It is on the basis of the reduced rate provided in that agreement (60.61% of $1,465, the lowest combination rate for the land-grant mileage, or about 88.8$ per hundred pounds) that plaintiff contends the charge should be computed.
Unlike a private party, the United States may contract with the rail carriers for transportation of goods “at reduced rates.” 49 U.S.C. § 22. The land-grant equalization agreement was authorized by this section, but that section is utilized ha many other situations as well. Thus, the carriers need not as a general rule abide by their published tariffs in dealing with the United States. Since such deviations are authorized by § 22 of the Interstate Commerce Act, such a rate is said to be the product of a “section 22 agreement” or to be a “quotation rate.” We use these terms in contradistinction to a rate based on a land-grant equalization agreement. In the year 1944 there was in existence Quotation 193A which provided a § 22 rate to the Government of 750 per hundred pounds for fuel oil from Baytown to Seattle, Wash *336 ington. No § 22 quotation provided a rate for transit from Baytown to the ultimate destinations nor from Seattle to the ultimate destinations. There was, however, a tariff on file with the Commission which provided a rate of 4.50 per hundred pounds for all shippers from Seattle to the ultimate destinations. The United States maintains that it is entitled to combine the § 22 Baytown-Seattle rate with the Seattle-Edmonds (and Richmond Beach) tariff rate. This would produce a total rate of 79.50.
As a general rule, if a through rate is in existence, the shipper may not combine the intermediate rates; the through tariff is the only lawfully applicable rate. Baltimore & O.S.W.R. Co. v. Settle, 260 U.S. 166. On the other hand, if a § 22 quotation rate reveals an intention that it may be so used, it may be combined with another quotation rate to produce an aggregate rate lower than the through tariff rate. Cf. Union Pacific R. Co. v. United States, 152 Ct. Cl. 523, 287 F. 2d 593. And perhaps, since the Government may receive preferences, a quotation rate may also be combined with a local tariff if the quotation is designed to be used in that manner. However, for obvious reasons [4] the parties have stipulated[5] that this case will turn upon another issue— whether the Government may avail itself of the following provision in the Baytown-Edmonds and Richmond Beach through tariff and aggregate the rates as it desires.
“If the aggregate of separately established (joint, local and/or proportional) rates applicable on Interstate traffic contained in tariffs lawfully on file with the Interstate Commerce Commission applicable via any route over which the through rates published in this tariff apply, produces a lower charge on any shipment than the rate published herein, such aggregate of rates will apply via all routes * * * over which the rates shown in this tariff are applicable, and the through rate published in this tariff has no application to that shipment.” (Emphasis supplied) Finding No. 8(a).
Seattle was not an intermediate point between Baytown and Edmonds and Richmond Beach over the route of actual *337 movement. Nevertheless the above tariff rule upon which the defendant relies required the aggregation of rates if the “separately established * * * [rates] applicable via any route over which the through rates published by this tariff apply, produce [d] a lower charge. * * *” Seattle was an intermediate point between origin and destination via the Stockton-Bieber route, another route to which this tariff applied. The plaintiff appears to admit that the § 22 Quotation 193A rate also applied to shipments to Seattle by way of the Stockton-Bieber route. In construing the aggregation rule, therefore, we may treat this case as if Seattle had in fact been an intermediate point on the route of actual movement.
Although some § 22 quotations were actually filed with the I.C.C., as the Commissioner found, Quotation 193A was not. Thus the aggregate rule at least does not permit use of this particular quotation in combination with the local tariff. The mere fact that item No. 4 of Quotation 193A provided that shipments made thereunder would be “subject * * * to all other priviliges, charges and rules which in any way increase or decrease the amount to be paid on any shipment, * * *” does not indicate that it was to be considered a rate on file with the Interstate Commerce Commission within the meaning of the aggregate rule of the through tariff. The aggregate rule, as included in the quotation, only applied to permit the aggregate of intermediate rates between Baytown and Seattle. This the United States is not attempting to do.
Nor would the fact that § 4 of the Interstate Commerce Act[6] may have a broader scope than the aggregate of intermediate rates rule contained in the tariff require a different result.[7] It provides in pertinent part that:
“It shall be unlawful for any common carrier subject to this chapter * * * to charge or receive any greater compensation in the aggregate for the transportation of *338 passengers, or of like kind of property, for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or to charge any greater compensation as a through rate than the aggregate of the intermediate rates subject to the provisions of this chapter. * * *”
It is well established that the mere fact that a published rate is violative of § 4 does not give the shipper the right to apply the “legal” rate. Davis v. Portland Seed Co., 264 U.S. 403; Swift & Co. v. Alton R. Co., 268 I.C.C. 103, 106. Only if the rate is “unreasonable” has the shipper established that an overcharge has occurred. Birmingham Traffic Bureau v. Director General, 115 I.C.C. 33; Virginia-Carolina Chemical Co. v. Atlantic Coast Line R. Co., 78 I.C.C. 107. And, it is, of course, not within our competence to determine such a question See United States v. Western P. R. Co., 352 U.S. 59; Davis v. Krauss Bros. Lumber Co., 25 F. 2d 888 (D.C. E.D. La. 1928). Since the Government may not aggregate the quotation and tariff rates as it desires, the land-grant equalization agreement rates apply to these shipments.
The 28 Shipments. The 28 shipments moved through Bichmond Beach and Edmonds to Seattle; upon reconsignment they were back-hauled from Seattle to their ultimate destinations. Both parties agree that this charge is to be computed in accordance with Bule 14 of plaintiff’s recon-signment tariff. It provides in pertinent part:
“ (a) Before placement. — If a car is diverted or reconsigned before placement for unloading, the through rate (Buie 2 in Item No. 30) will be applied from original S.ng point to final destination which would apply in sence of the out-of-line service, plus the applicable rates (or back-haul rates if any), to cover the back-haul service in each direction, * * * but not in excess of the full combination of tariff rates applicable on a shipment terminating at and on a shipment originating at the point of diversion or reconsignment, * * *” (Emphasis supplied) Finding No. 11.
In other words, the through rate from origin to final destination (plus back haulage) is to be applied unless the combination of the origin-reconsignment point rate and the reconsignment point-destination rate produces a lower charge. Obviously the literal language of this rule precludes *339 combination of the quotation rate with the back-haul route local tariff to compute the maximum charge since the quotation is not a “tariff.” However, we must remember that these shipments originally moved under Quotation 193A since they were shipped to Seattle. We cannot believe that, in the light of Item 4 of the quotation, it was the intention of the parties in a true case of reconsignment to compute the charge as if a through shipment had been involved. But compare Davis v. Krauss Bros. Lumber Co., 25 F. 2d 888 (D.C. E.D. La. 1928). Item 4 of the quotation provided:
“In the absence of specific provisions to the contrary in this Quotation, shipments made hereunder are subject to ail charges and all allowances for or in respect of diversion, reconsignment, demurrage, switching, and to all other privileges, charges and rules which in any way marease or decrease the amount to be paid on any shipment, or which increase or decrease the value of the service as provided in applicable tariffs on file with the Interstate Commerce Commission, or by Section 22 Quotations, without, in any case, any land-grant deduction.” (Emphasis supplied). Finding No. 10.
Thus we should compute the charge using the quotation and we are to treat the case as if Rule 14 were included within the quotation; in so doing we should interpret that rule so that it serves the same function with regard to the quotation that it would serve with respect to an ordinary tariff on file with the Commission. The purpose of Rule 14 was to permit the aggregation of favorable rates in the case of reconsignment. We conclude, therefore, that in these circumstances the quotation is to be treated as a “tariff” for the purposes of Rule 14, and that the United States may combine the quotation rate and local tariff to produce the maximum charge on these 28 shipments.
Of course, if the United States originally had intended to reconsign, we would look to the through tariff rather than the quotation in computing the charges. Cf. Baltimore & O.S.R. Co. v. Settle, 260 U.S. 166; Marshall Mfg. Co. v. Texas & P.R. Co., 29 F. 2d 660 (C.A. 5).
As to the 28 shipments referred to above, the plaintiff is not entitled to recover. Plaintiff is entitled to recover as to *340 tbe 178 shipments and judgment to that effect will be entered for the plaintiff with the amount of recovery to be determined pursuant to Buie 38(c).
It is so ordered.
Durfee, Judge/ Laramoee, Judge; and Jones, OMef Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of Trial Commissioner Saul Bichard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of the State of Minnesota and is a common carrier by railroad in interstate commerce over its own lines and jointly with other lines.
2. During the year 1944 defendant requested plaintiff and its connecting carriers to perform interstate rail transportation service for defendant by transporting a commodity described in the applicable Government bills of lading as “Fuel Oil Distillate (Oil Fuel Diesel Army Spec. 2-102-C Grade C) ” from Baytown, Texas, to Edmonds or Bichmond Beach, Washington. Said transportation service was performed in 1944.
3. The shipments herein involved were covered and described by 208 Government bills of lading, numbered as set forth in the document labeled “Schedule A” annexed to the petition filed herein, the list of numbers set forth in said schedule being incorporated herein by reference.
Of these shipments, those covered by the 29 Government bills of lading bearing the numbers set forth in paragraph 4 of the stipulation filed herein, which list of numbers is incorporated herein by reference, originated at Baytown, Texas, and were consigned to Seattle, Washington, but were reconsigned from there (except the shipment moving under bill of lading WT-7377884 which was diverted at Hillyard, Washington to Bichmond Beach, Washington) and ultimately shipped to Edmonds or Bichmond Beach, Washington, making 28 shipments so reconsigned to such points from Seattle,
*341 The remaining 177 shipments originated at Baytown, Texas, and were destined and delivered to either Edmonds or Richmond Beach, Washington.
4. The 206 shipments moved over the following route and were transported by the following carriers: Texas and New Orleans Railroad to Houston, Texas; Burlington-Rock Island to Teague, Texas; Fort Worth & Denver City Railway to Sixela, New Mexico; Colorado and Southern Railway to Wendover, Wyoming, via Denver; Chicago, Burlington & Quincy Railroad to Laurel, Montana; and Great Northern Railway through Great Falls, Montana, Spokane, Washington, and Everett, Washington, to Edmonds and Richmond Beach, Washington. This route of movement consisted entirely of non-land grant mileage.
The 28 shipments consigned and delivered to Seattle and ultimately reconsigned from there and delivered to Edmonds and Richmond Beach followed the same route except that from Everett, which was north of Seattle, they were routed to Seattle, and then, upon their reconsignment to Edmonds and Richmond Beach, had to be routed back to those points, which were between Everett and Seattle.
5. The parties have agreed that the following bills of lading, copies of which are annexed to the stipulation filed herein and which bills are incorporated herein by reference, are representative of each of the following movements:
(a) WQ-12706925, WQ-15787683 and WQ-15787837 cover shipments originally consigned to Seattle, Washington, and there reconsigned to Edmonds, Washington.
(b) WT-7377946 and WT-7377948 cover shipments originally consigned to Seattle, Washington, and there reconsigned to Richmond Beach, Washington.
(c) WT-7377884 covers the shipment originally consigned to Seattle, Washington, but diverted at Hillyard, Washington, to Richmond Beach, Washington.
(d) WT-7378323 and WT-7378405 cover shipments originating at Baytown, Texas, consigned and delivered to Richmond Beach, Washington.
6. At the time said shipments were transported, plaintiff and its connecting carriers forming the route of movement *342 herein were parties to a Freight Land-Grant Equalization Agreement, which provided in pertinent part as follows:
The carriers shown herein as parties to agreement, agree, subject to the conditions and exceptions stated below, to accept for the transportation of property shipped for account of the Government of the United States and for which the Government of the United States is lawfully entitled to reduced rates over land-grant roads, the lowest net rates lawfully available, as derived through deductions account of land-grant distance from lawful rates filed with the Interstate Commerce Commission or the various State commissions applying from point of origin to destination at time of movement.
For said shipments, plaintiff is claiming net land-grant charges under said equalization agreement.
7. Under the land-grant equalization agreement plaintiff and its connecting carriers were obligated to transport defendant’s shipments over the aforesaid non-land-grant route of movement at the same tariff rates on file with the Interstate Commerce Commission that were applicable via the governing land-grant route between origin and destination at time of movement and from which rates land-grant deductions were required to be made.
The governing land-grant route on said 206 shipments was composed of the following lines of railroad: Missouri Pacific to Cairo, Illinois, via Texarkana, Arkansas; the Illinois Central to LeMars, Iowa; Chicago and North Western to Superior, Wisconsin; Northern Pacific to Seattle, Washington; and Great Northern Bailway from Seattle to destination Since defendant could have routed the shipments over this land-grant route and thereby become entitled to a statutory reduction on account of land grant from the tariff rates on file with the Interstate Commerce Commission applying thereover, plaintiff and its connections, to remain competitive with this land-grant route on Government traffic, entered into the Freight Land-Grant Equalization Agreement by which they agreed to accept the same net charges on Government traffic over the non-land-grant route of movement. Under this agreement, it was therefore necessary to determine the tariff rates on file with the Interstate Commerce Commission *343 applying over the land-grant route notwithstanding that the shipments did not move over that route.
8. At the time the shipments were made, the following tariffs were on file with the Interstate Commerce Commission and were published and in effect according to law:
(a) Trans-Continental Freight Bureau West-Bound Tariff No. 4-U.—This tariff provided, in item 4180, a joint single factor through rate of $1.45 per 100 pounds on fuel oil distillate from Group H points to destinations taking Rate Bases 1,2 and 3. Baytown, Texas, is a point located in Group H. Edmonds, Richmond Beach and Seattle, Washington, are, under Trans-Continental Freight Bureau, North Coast Territorial Directory No. 40-1, another tariff on file with the Interstate Commerce Commission, published and in effect during the time herein involved, points taking Rate Basis 1. However, said rate of $1.45 per 100 pounds applying from Baytown, Texas, to Edmonds and Richmond Beach, Washington, did not apply to those points via the governing land-grant route. The $1.45 rate applied to Edmonds and Richmond Beach only via gateways such as Laurel, Montana, Bieber, California, and Minneapolis, Minnesota, thence via the Great Northern Railway, which routes would furnish the destination carrier (Great Northern) a relatively longer haul (and a greater division of the revenue) than would obtain had the destination carrier agreed to accept the shipment at Seattle for further transportation to Richmond Beach and Edmonds at that rate from carriers forming the governing land-grant route. However, said $1.45 rate did apply to Seattle, Washington, an intermediate point over said land-grant route.
Said tariff also contained, in Item No. 6700, under the heading “Aggregate of Intermediate Rates” a provision relating to the construction of a combination rate, reading in pertinent part as follows:
If the aggregate of separately established (joint, local and/or proportional) rates applicable on Interstate traffic contained in tariffs lawfully on file with the Interstate Commerce Commission applicable via any route over which the through rates published in this tariff apply, produces a lower charge on any shipment than the rate published herein, such aggregate of rates *344 will apply via all routes * * * over which the rates shown in this tariff are applicable, and the through rate published in this tariff has no application to that shipment.
(b) Trans-0ontinental Freight Bv/reau West-Bovmd Tariffs 1-X, effective August IS, 191$, and 1-Y, effective August IS, 191$.. — These tariffs, in items 4185 and 6935 respectively, provided a rate of 95 cents per 100 pounds on carloads of fuel oil distillate from points of origin in Group F to destinations taking Rate Bases 2 and 3. Baytown, Texas, is a point located in Group F and, under Trans-Continental Freight Bureau, South Coast Territorial Directory No. 41-H, another tariff on file with the Interstate Commerce Commission and published and in effect during the time herein involved, Stockton, California, is a point taking Rate Basis 3. This rate applied over many tariff routes, including the route of the Atchison, Topeka & Santa Fe Railway via Farwell, Texas, to Stockton, California.
(c) Pacific Freight Tariff Bureau, Tariff No. 1-S. — This tariff provided a rate of 47 cents per 100 pounds on shipments of fuel oil distillate from Stockton, California, to Seattle, Washington. This rate would apply to the route of the Western Pacific Railroad to Bieber, California, and thence via the Great Northern Railway to Seattle, Washington.
(d) North Pacific Ooast Freight Bureau, Local, Joint and Proportional Freight Tariff No. If-O. — This tariff provided a rate of 4.5 cents per 100 pounds on shipments of fuel oil distillate from Seattle, Washington, to Edmonds and Richmond Beach, Washington.
9. At the time the shipments herein involved were made, there was in effect and published a circular of the Interstate Commerce Commission called Tariff Circular No. 20, which set forth “Rules to Govern the Construction and Filing of Freight-Rate Publications Including Pipe-Line Schedules and Classifications.” These rules, denominated “Administrative Rulings,” contained the following:
(a) Rule 14(c). Rates for through shipments are often made by adding together two or more rates. All rates used in making combination through rates for interstate shipments, including rates between points in one *345 State, must be filed with the commission and posted at stations and can only be changed as to such traffic in accordance with the terms of the act.
(b) Eule 55(a). A rate named from origin to destination only legal rate. — When a rate, whether local or joint, from point of origin to destination, has been established via a route, it becomes the only legal rate for through transportation via that route, whether it is greater or less than the aggregate of intermediate rates.
(5). If no rate is named from point of origin to destination of a shipment via the route of movement, the lowest combination of rates applicable via the route of movement is the legal rate. * * *
(e). If, in applying combination rates on a through shipment, the shipment moves from a point of origin (or to a point of destination) intermediate to a base point upon which the lowest combination makes, or moves via a junction point with connecting or branch line intermediate to the base point upon which the lowest combination makes, such combination must be applied; and it is not necessary to haul the shipment to such base point and back again through (or to) such intermediate point of origin (or destination), or such intermediate junction point; provided (1) that the rates used in such combination are applicable over the route the shipment would have moved had it been hauled to the base point and back again over the same route; and (2) that compliance with routing instructions will permit movement to the base point and back again over the same route.
Note. — This rule does not authorize equalizing via one route or gateway the combination of rates applicable over another route or via a different gateway, and does not confer any authority to depart from the provisions of the fourth section of the act, which prohibits higher charges for shorter than for longer distances over the same route and higher charges than the aggregate of the intermediate rates over the same route. It must also be understood that in a case where the lowest combination of rates makes on a base point as to which the point of origin or of destination is directly intermediate, a specific rate to or from such point that is higher than such combination is included in the commission’s, ruling that a through rate that is higher than the combination of intermediate rates between the same points is prima facie unreasonable. It must be further understood that in applying the lowest combination authorized in this section the commission expresses no opinion as to the reasonableness of a rate so constructed.
*346 (c) Rule 56. ReductioN of Rate To Equal. the Aggregate of the Intermediate Rates. — (a) Section 4 of tbe act, as amended, prohibits the charging of any greater compensation as a through rate than the aggregate of the intermediate rates that are subject to the act. The commission has frequently held that through rates which are in excess of the sum of the intermediate rates between the same points via. the same route are prima fade unreasonable. Many informal complaints are received in connection with regularly established through rates which are in excess of the sum of the intermediate rates between the same points. The commission has no authority to change or fix a rate except after full hearing. It is believed to be proper for the commission to say that if called upon to formally pass upon a case of this nature it would be its policy to consider a rate which is higher than the aggregate of the intermediate rates between the same points via the same route as prima fade unreasonable and that the burden of proof would be upon the carrier to defend such unreasonable rate.
10. By letter dated August 22, 1944, addressed jointly to the War and Navy Departments, a number of carriers, including plaintiff and its connecting carriers herein involved, acting by the Vice President of the Association of American Railroads as their authorized agent, quoted and offered to defendant, pursuant to Section 22 of the Interstate Commerce Act, certain rates and charges to be applied on shipments of diesel fuel oil and fuel oil distillate. This quotation and offer was entitled “A.A.R. [Association of American Railroads] Section 22 Quotation No. 193-A” and canceled a previous one referred to as “A.A.R. Section 22 Quotation No. 193.” Quotation 193-A provided in pertinent part as follows:
Item No. 1 Traffic Covered
The traffic covered by and subject to this Quotation is diesel fuel oil and/or fuel oil distillate, estimated weight as per Item No. 4180-A of T.C.F.B. Tariff No. 4-T, Agent L. E. Kipp’s I.C.C. No. 1487, in tank cars, shipped by the War Department and/or Navy Department, hereinafter referred to as “the Government,” on Government bills of lading, all-rail, in carloads, from Trans-Continental Group H to Seattle, Wash.
*347 Item No. 2 Bates and Routes
Subject to compliance with all the terms and conditions of this Quotation, each shipment of the kind described in Item No. 1 will be subject and entitled to the through all-rail carload rate, 750 per 100 pounds, minimum weight as per Classification Rule 35, applicable only via routes provided in T.C.F.B. Tariff No. 4-T, Agent L. E. Kipp’s I.C.C. No. 1487, and subject to the provisions of Notes 2 and 9, Item No. 4180-A of said tariff.
Item No. 3 Land-Grant Deductions Not Applicable
The rates provided under this Quotation are special rates not available to commercial shippers and are, therefore, not subject to any deduction on account of land grant, but nothing in this Quotation shall deprive the Government of the right to avail itself of any published tariff rate to which it lawfully is entitled, less any lawfully applicable land-grant deduction.
Item No. 4 Charges and Allowances
In the absence of specific provisions to the contrary in this Quotation, shipments made hereunder are subject to all charges and all allowances for or in respect of diversion, reconsignment, demurrage, switching, and to all other privileges, charges and rules which in any way increase or decrease the amount to be paid on any shipment, or which increase or decrease the value of the service as provided in applicable tariffs on file with the Interstate Commerce Commission, or by Section 22 Quotations, without, in any case, any land-grant deduction.
* * * * *
Item No. 6 Effective Date
This Quotation shall be in effect and applicable to all shipments moving hereunder from point of origin:
(a) As to fuel oil distillate, on and after January 1, 1943;
(b) As to diesel fuel oil, on and after August 1,1943.
A.A.R. Section 22 Quotation No. 193 is withdrawn and cancelled effective as of August 1, 1943, without prejudice to any accrued rights or liabilities of either party thereunder.
*348 Item No. 8 Acceptance of Quotation
This Quotation, when accepted by the Government by making any shipment under the terms hereof or otherwise, will constitute an agreement between the panties hereto as to the transportation services herein described.
This Section 22 quotation was not filed with the Interstate Commerce Commission or any of the various state commissions at the time of the shipments herein involved, Section 22 of the Interstate Commerce Act at that time containing no requirement for any such filing.
11. At the time the 29 shipments referred to in finding 8 were made, there was on file with the Interstate Commerce Commission (No. A-8137) and published and in effect according to law, Great Northern Eailway Company Tariff “G.N. Ey. G.F.O. No. 1240-P,” entitled “Local and Joint Freight Tariff Providing Eules and Charges Governing the Diversion or Eeconsignment of Freight and Holding of Cars for Surrender of Bills of Lading or Written Orders, or Inspection at points on the above named lines.” The following rules were contained therein:
(a) Eule 2:
Item No. 30 Application of Freight Bates
Where the through rate is authorized under these rules, it is the applicable rate (local rate, joint rate, or combination of intermediate rates) in effect on date of shipment from point of origin over the route of movement via the diversion or reconsignment point to final destination. * * *
(b) Eule 14:
Item No. 90 Back-Haul Buie
(a) Before placement. — If a car is diverted or reconsigned before placement for unloading, the through rate (Eule 2 in Item No. 30) will be applied from original shipping point to final destination which would apply in the absence of the out-of-line service, plus the applicable rates (or back-haul rates if any), to cover the back-haul service in each direction, plus charge of $6.44 per car will be made in such cases when diversion or recon-signment is performed in the States of Montana, Idaho, Washington, Oregon or California and $6.93 per car *349 when, diversion or reconsignment is performed in the States of Minnesota, North Dakota, South Dakota, Iowa or Wisconsin, but not in excess of the full combination of tariff rates applicable on a shipment terminating at and on a shipment originating at the point of diversion or reconsignment, without the addition of diversion or reconsignment charge. * * *
(b) After placement. — If a car has been placed for unloading at original billed destination and is forwarded therefrom without being unloaded, it will be subject to the tariff rates applicable on a shipment terminating at and on a shipment originating at the point of diversion or reconsignment. * * *
12. (a) Effective January 1, 1945, after the shipments herein involved were made, A.A.R. Section 22 Quotation No. 193-A was amended to provide a rate of 75 cents per 100 pounds on fuel oil distillate from Baytown, Texas, and other points of origin to all North Pacific Coast points, including Edmonds and Bichmond Beach, Washington. This amendment resulted from requests by the Navy Department in a letter dated November 18, 1944, and by the Army Service Forces, Office of the Chief of Transportation, in a letter dated November 29,1944.
(b) Said Navy Department letter, addressed to the Vice President of the Association of American Railroads referred to in finding 10, read in pertinent part as follows:
Subject: Petroleum Products moving from Trans-Continental Groups D through J to destinations in North Coast and South Coast Territory — Proposed Section 22 Quotation.
Enclosure :
(A) Statement showing Navy Department movement of petroleum products from Transcontinental Groups D through J to destinations in North Coast and South Coast Territory.
(B) Statement showing present and proposed rates from Transcontinental origin Groups D through J to North Coast and South Coast Territory.
Sir: The Navy Department, through the Bureau of Supplies and Accounts, has been moving large quantities of gasoline, diesel oil, and fuel oil in the past few months from origins in Transcontinental Groups D through J to destinations in both North Coast and South Coast *350 territory. The approximate present movement of gasoline, diesel oil, and fuel oil is set forth in enclosure (A). This movement is expected to continue in its present volume and perhaps may increase. These movements obviously are abnormal and bear no resemblance whatsoever to the ordinary peacetime commercial movements. Hence, currently published rates do not reflect the more favorable transportation conditions now present, and under the circumstances are not reasonable for application on the present movement. For this reason, this Bureau requests that the carriers make effective through the medium of a Section 22 Quotation a reduced basis of rates. It is understood that the War Department is also shipping petroleum products in this same general territory, and that the War Department will also request the carriers to make effective a new and reasonable basis of rates, which will cover the traffic in which the War Department has a primary interest.
*****
At the present time there is available to the Government A.A.B. Section 22 Quotation No. 193-A, which makes available a rate of 75$ per 100 pounds on diesel fuel oil and/or fuel oil distillate from Transcontinental Group H to Seattle, Washington. A.A.B. Section 22 Quotation No. 419 covers the same commodities and makes available to the Government a rate of 66%$ per 100 pounds from Transcontinental Group J to Seattle, Washington. In addition, it is the understanding of the Bureau that the South Coast carriers have offered the Defense Plant Supplies Corporation A.A.B. Section 22 Quotation No. 436, which makes available to that corporation a rate of 70‡ per 100 pounds on crude petroleum from West Texas points to South Coast points.
The rates which are suggested as a basis for a Section 22 Quotation for application to all petroleum products, gasoline, diesel oil, etc., between the origin and the destination territories here involved are set forth on enclosure (B). The suggested basis is predicated upon A.A.B. Section 22 Quotation Nos. 193-A and 419. It will be noted that the rates contained in both the published tariffs and the aforementioned Section 22 Quotations represent the highest and the lowest rates from the particular origin groups involved to both North Coast and South Coast points.
*****
Appended to the letter as Enclosure B was a statement showing “Present and Proposed Kates” on gasoline, diesel *351 oil, fuel oil and lubricating oil from Trans-Continental Groups I) through J to both South Coast points and North Coast points. This statement showed that the published tariff rate from Group H points (which includes Baytown, Texas) to North Coast points (which include Richmond Beach and Edmonds, Washington): (1) on gasoline, diesel oil and fuel oil was $1.45 per 100 pounds; (2) on lubricating oil was $1.36 per 100 pounds; and (3) the suggested Section 22 basis applicable to all petroleum products was 75 cents per 100 pounds.
(c) Said letter from the Army Service Forces, Office of the Chief of Transportation, addressed to the Association of American Railroads, attention of said Vice President, read in pertinent part as follows:
It is requested that rates shown in Appendix A be established by Section 22 Quotation to apply on refined petroleum products (gasoline, diesel oil and lubricating oil), in tank cars, with usual minima, to apply between Transcontinental Groups D thru J and installations located, in the North Coast and South Coast area, including installations located in the States of Idaho, Nevada, Utah and Arizona. Appendix A shows present and proposed rates.
It is understood that the Navy Department is also filing a like request covering traffic in which it is interested.
* * * *
Under such conditions, the movement is obviously abnormal. It bears no resemblance whatever to commercial movements — and there is no competition between this traffic and commercial traffic. From a study of the flow of military petroleum traffic, it is hard to escape the conclusion that a very large portion is moving on rates not adjusted to the flow. The greater portion of the tariff rates are actually only paper rates insofar as this traffic is concerned, and do not represent actual traffic conditions. Much of the traffic is moving in traffic currents directly opposite to the normal peacetime flow and at rates that really never were intended to move more than “distress shipments”, certainly no large volume. The present Army-Navy volume of petroleum traffic cannot be classed as merely “distress shipments.” * * * * *
The proposed rates have been grouped to both North and South Coast Territory. It is noted that present *352 published rates to North Coast points are grouped, the same rate from origin Groups D thru J applying on gasoline, diesel oil, fuel oil and lubricating oil. * * * It isn’t likely that other commercial petroleum products have moved hi volume under presently effective Group D thru J rates between the Pacific Coast Territory and interior points in these origin groups due primarily to the system of commercial distribution, and the fact that present rates as published were never designed to move petroleum traffic in volume. Under these circumstances, it is not felt that present published rates are reasonable maxima rates or can be used as a measure for reasonable maxima rates on the current Army-Navy volume. * * *
Rates proposed are based on the 75 cent rate named in AAR Section 22 Quotation No. 193-A, applying on diesel fuel oil and fuel oil distillate from Group H origins to Seattle, Washington, and Section 22 Quotation No. 419, covering the same commodities from Group J origins to Seattle, Washington, of 66% cents. It is also understood that South Coast carriers have offered the Defense Plant Supplies Corporation AAR Section 22 Quotation No. 436, making available to that Corporation a rate of 70 cents per 100 pounds on crude petroleum from Texas origins to South Coast destinations. The percentage relation of proposed rates for Groups E thru I, inclusive, is the same as that of the present published rates bear to Group D rates, grouping all petroleum products for the same purpose of proposed basis. Such grouping conforms to action of the rail lines in the published basis to North Coast points.
‡ H* $ $ ‡
Appendix A to the above letter was a statement showing “Present and Proposed Rates” on gasoline, diesel oil, fuel oil and lubricating oil from Trans-Continental Groups D through J to both South Coast and North Coast points. This statement showed that the published tariff rate from Group II points (which includes Baytown, Texas) to North Coast points (which include Edmonds and Richmond Beach, Washington) on (1) gasoline, fuel oil and diesel oil was $1.45 per 100 pounds, (2) on lubricating oil was $1.36 per 100 pounds, and (3) the suggested Section 22 basis applicable to all petroleum products was 75 cents per 100 pounds.
(d) The rate of $1.45 named in the above letters from Group H points of origin to North Coast points of destination was the published tariff rate.
*353 13. During the year 1944, it was the understanding of plaintiff and the Association of American Railroads that rates provided in Section 22 quotations naming rates from given origins to given destinations could not be used as factors together with published tariff rates in constructing combination rates going beyond the destination named in the Section 22 quotation. Their understanding was that the quotation rates did not apply to anything other than traffic actually originating or terminating at the specific points named in the quotation. The question came to plaintiff’s attention for the first time in January 1944 in connection with a rate provided in another Section 22 Quotation (A.A.R. No. 181-A), dated November 18, 1943. Plaintiff’s interpretation thereof, as set forth above, was subsequently confirmed by the Association after consideration and recommendation by a private committee composed of railroad executives (the Traffic Executive Chairmen’s Committee). By Amendment No. 7, dated October 29, 1945, to A.A.R. Section 22 Quotation 181-B, dated April 10,1944, which had canceled and superseded Quotation 181-A, it was provided:
When a shipment of the kind described by Item No. 1 is consigned or reconsigned to a destination named in this item or to a directly intermediate point and is not subject to the through rate provided herein under provisions of tariffs governing diversion or reconsignment privileges, or because of the use of unauthorized routing, the rate named in this item will also apply as a factor with other applicable rates in constructing combination rate.
The provisions of this paragraph apply only on shipments destined to points in California.
14. Plaintiff is claiming transportation charges based upon a combination of rates constructed as follows: Baytown, Texas, to Stockton, California, 95 cents per 100 pounds, in accordance with the tariff set forth in finding 8 (b); Stockton, California, to Seattle, Washington, 47 cents per 100 pounds, in accordance with the tariff set forth in finding 8(c); Seattle, Washington, to Edmonds and Richmond Beach, Washington, 4.5 cents per 100 pounds, in accordance with the tariff set forth in finding 8(d). Plaintiff contends *354 that, since there was no joint single factor through rate on the shipments applying over the governing land-grant route from origin to destination at the times of movement (finding 8(a)), it therefore becomes necessary, when computing the land-grant charges under the equalization agreement (findings 6, 7), to determine, in accordance with the provisions of Rule 14(c) (finding 9(a)) and Rule 55(b) of the Interstate Commerce Commission’s Tariff Circular 20 (finding 9 (b)), the lowest combination of intermediate rates set forth in tariffs duly filed with the Interstate Commerce Commission in accordance with law which apply on the traffic over the governing land-grant route.
One combination of intermediate tariff rates applying over said governing land-grant route between Baytown, Texas, and Richmond Beach and Edmonds, Washington, would be composed of the $1.45 rate to Seattle, which would not apply to Richmond Beach and Edmonds, Washington over the governing land-grant route, but would apply to Seattle, an intermediate point over that route (finding 8(a)), and said 4.5-cent rate from Seattle, Washington, to Richmond Beach and Edmonds, Washington, making a total rate of $1,495 per 100 pounds. However, said $1.45 rate to Seattle was subject to the “Aggregate of Intermediate Rates” rule set forth in the same tariff (finding 8 (a)). Since said $1.45 rate applied to Seattle over either the governing land-grant route or said route of the Atchison, Topeka & Santa Ee Railway to Stockton, California, the Western Pacific Railroad to Bieber, California, and the Great Northern Railway to Seattle, Washington, the combination of the 95-cent and 47-cent tariff rates applying over the Stockton route to Seattle could also, by virtue of said Aggregate of Intermediate Rates rule, be applied over the governing land-grant route to Seattle. To that combination, plaintiff adds the 4.5-cent rate from Seattle to destination to complete the through combination of tariff rates between origin and destination over the governing land-grant route. Said filed tariff rates of 95 cents, 47 cents, and 4.5 cents, totaling $1,465, produces the lowest combination of filed and published tariff rates applying over said governing land-grant route on the shipments herein involved at the time of movement. Land-grant *355 deductions under the equalization agreement are then applied to this combination rate of $1,465.
As to the 177 shipments consigned to Richmond Beach and Edmonds, Washington, plaintiff denies the applicability of the Section 22 quotation rate of 75 cents on the ground, among others, that, under Item 1 of the quotation, the rate only covers traffic to Seattle, Washington, whereas these shipments were not consigned to Seattle. Further, plaintiff makes the same contention concerning the 29 shipments that were consigned to Seattle, Washington, since these shipments (except for the one diverted) were, after arrival at Seattle, subsequently reconsigned to Edmonds and Richmond Beach, and plaintiff takes the position that the ultimate destination is the controlling point for the purpose in question, the effect of reconsignment or diversion being, according to plaintiff, to convert the shipment to a shipment to ultimate destination. Plaintiff concedes that if the shipments had finally terminated at Seattle and not been reconsigned, then the 75-cent Section 22 quotation would be applicable.
15. Defendant is claiming transportation charges based upon a combination of rates constructed as follows: Bay-town, Texas, to Seattle, Washington, 75 cents per 100 pounds, in accordance with A.A.R. Section 22 Quotation No. 193-A (finding 10) plus a rate of 4.5 cents per 100 pounds from Seattle, Washington, to Edmonds and Richmond Beach, Washington, in accordance with the tariff set forth in finding 8(d), making a total rate of 79.5 cents. Defendant applies this combination of rates over the route of movement. As shown by finding 4, with respect to the 177 shipments consigned to Richmond Beach and Edmonds, the route of movement did not actually go to or through Seattle. However, as shown by findings 8(a) and 14, Seattle is an intermediate point over the governing land-grant route to which point the $1.45 tariff rate applied, and plaintiff, under the Aggregate of Intermediate Rates rule uses Seattle as such a point in constructing its proposed rate. Defendant claims the 79.5-cent rate upon the contention, among others, that the Section 22 quotation is a rate offered to the Government in lieu of the carrier’s published tariff rate, and, as a lower commodity *356 rate restricted to Government shipments, becomes available for use even though, the shipment goes beyond the Section 22 quotation destination point (in the same way that the tariff does for which the quotation substitutes). Defendant accordingly contends that since, in this instance, there was a published tariff rate of $1.45 from Baytown, Texas, to Seattle, Washington, which rate is, under the Aggregate of Intermediate Eates rule, reduced to $1.42, the Section 22 quotation rate of 75 cents merely substitutes for said $1.42 rate. Defendant claims that the Section 22 quotation, and in particular Item 4 thereof (finding 10), properly interpreted, is subject to all the routings in the tariff so that it would be applicable to the same routing to Seattle via Stockton, California, upon which plaintiff constructs its combination rate and that, in addition, it is entitled “to all other privileges, charges and rules which in any way * * * decrease the amount to be paid on any shipment, or which * * * decrease the value of the service as provided in applicable tariffs on file with the Interstate Commerce Commission * * Defendant contends that this provision would make the Aggregate of Intermediate Eates rule applicable to the Section 22 quotation herein involved.
16. The parties have stipulated that if the Aggregate of Intermediate Eates rule, contained in the tariff set forth in finding 8(a), did not apply to the single factor through rate of $1.45 applicable to Edmonds and Eichmond Beach, set forth in such tariff, the use of the quotation rate set forth in said Section 22 Quotation 193-A (finding 10) in combination with a tariff rate on this traffic between origin and destination would be precluded. This stipulation was based partly upon Eule 55(a) of the Interstate Commerce Commission Tariff Circular No. 20 set forth in finding 9, and partly upon a ruling (B-98076) by the Assistant Comptroller General of the United States, dated October 9, 1951, which stated in part as follows:
* * * In the instant matter the publication of a joint through tariff rate, applying from the point of origin to the point of destination of the movement precluded the use, independently of authority contained in the tariff publishing the through joint rate, of a combina *357 tion of tariff rates made over the point or points designated in the quotations. That being true the use of the quotation rate in combination with a tariff rate or rates over said points is not authorized.
17. The parties have further stipulated that if said Aggregate of Intermediate Bates rule contained in the tariff containing the single factor through rate of $1.45 to Edmonds and Eichmond Beach did not apply to said Section 22 Quotation 193-A, then the use of the 75-cent quotation rate in combination with the 4.5-cent tariff rate would not be proper and plaintiff would be entitled to the entire amount claimed on the 177 shipments which had been originally consigned to Eichmond Beach and Edmonds. This agreement did not cover the shipments which were originally consigned to Seattle and after arrival were reconsigned to Edmonds and Eichmond Beach.
18. In addition to the use of Section 22 quotations, reduced rates applicable only to Government shipments of Government property may be put into effect, and are sometimes so put into effect, by incorporating them in a tariff published and filed with the Interstate Commerce Commission, and such rates would not be, and are not, available to commercial shippers.
19. Class rates based upon the classification ratings are the maximum rates that may be charged the shipper. If a shipper wished to obtain a reduction in the class rate, such proposal would be presented to the carriers and if granted would then be published. This reduced class rate may be called either an “exception” rate, the next lower rate, or a “commodity” rate (named on certain commodities) which would represent a still further reduction, there being both general and specific commodity rates.
20. Upon completion of the transportation services herein involved, plaintiff, as the final and delivering carrier, billed defendant therefor and defendant originally made payment in the amounts so billed. Subsequently, plaintiff received notices from defendant stating that overpayments of said bills had been determined by the General Accounting Office and demanding refunds. Thereafter, plaintiff made certain refunds to defendant, and defendant made deductions from *358 other transportation charges owed plaintiff by defendant-concerning which there is no dispute. Said refunds and deductions totaled $14,043.11.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on its claim in part and judgment for the plaintiff is entered to that effect with the amount of recovery to be determined pursuant to Rule 38(c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on June 29, 1962, that judgment for plaintiff be entered for $12,392.13.

 The other shipment was diverted at Hillyard, Washington, to Richmond Beach before it reached Seattle. The charge on that shipment must he computed as if it had been one of the 177 shipments which went directly to Edmonds or Richmond Beach since plaintiff’s reconsignment tariff provided in pertinent part that “if a car is diverted . . . the through rate . . . wiU be applied from original shipping point to final destination which would apply in the absence of the out-of-line service [if there are no back-haul charges] . . . .” The arguments which apply to reduce the charge on the 28 shipments are not apposite to this single shipment since it never actually went to Seattle. See infra.

 Such a rate is arrived at by the concurrence of a number of connecting carriers which jointly serve a particular route.

 By 1946 all of these land-grant deductions were eliminated. 69 Stat. 606, 49 U.S.C. § 65.

 Seattle was not an intermediate point over the route of actual movement. See infra. And the Commissioner specifically found that the plaintiff did not contemplate such use of the quotation. Finding No. 13.

 See Finding No. 17.

 49 U.S.C. § 4.

 While the quotation may not be on file with the Commission, arguably it is a rate “subject to the provisions of [Chapter 1, Title 49 U.S.C.] * * *” within the meaning of the aggregation rule of § 4. Furthermore, carriage to Seattle was for a longer distance than carriage to Edmonds or Richmond Beach; thus, the long-haul short-haul prohibition may also apply.